## METROPOLITAN LIFE INS. CO. v. McNALL.

(Circuit Court, D. Kansas, First Division. June 29, 1897.)

### No. 7,490.

1. JURISDICTION OF FEDERAL COURTS—SUITS AGAINST STATE OFFICERS.
   A suit by a nonresident insurance company to enjoin a state superintendent of insurance from revoking its license to do business in the state is not a suit against the state, so as to prevent a federal court from taking jurisdiction. In re Ayers, 8 Sup. Ct. 164, 123 U. S. 443, distinguished.

2. FOREIGN INSURANCE COMPANIES—REVOCATION OF STATE LICENSE—STATE SUPERINTENDENT.
   The superintendent of insurance of Kansas has no authority under the state statutes to arbitrarily revoke the license of a life insurance company of another state to do business in Kansas merely because it refuses to pay an alleged loss, which it claims is fraudulent and illegal, until the same has been established by the judgment of a court.

3. SAME.
   In the Kansas act of 1889 (chapter 159) entitled "An act relating to insurance, and amendatory of section 24 of chapter 132, Laws of 1885," etc., which latter act concerns mutual fire insurance companies, the provisos limiting the power of the superintendent of insurance in respect to the granting and revocation of licenses to do business in the state apply to all insurance companies, including life insurance companies.

This suit is brought by the complainant, the Metropolitan Life Insurance Company, against Webb McNall, as superintendent of insurance of the state of Kansas, for the purpose of obtaining a perpetual

injunction restraining him from revoking the license of the complainant to do business in the state of Kansas.

The bill avers: That the complainant is a corporation organized and existing under the laws of the state of New York, and is a citizen of that state. That it has a capital stock of $2,000,000, actually paid up. That its capital stock and assets amount to over $3,000,000. That it is carrying on the business of life insurance in various states of the Union, including the state of Kansas. That in transacting its said business within the state of Kansas it has fully complied with all the laws for the regulation of life insurance companies, and with all legal rules and regulations of the department of insurance of said state. That it has been transacting business in Kansas since 1894, and prior thereto. That it has established a large number of agencies, and expended large sums of money in advertising and soliciting business, and has acquired a large and profitable business within said state. That license and permission to transact business within said state has been granted to it, and has been renewed and extended by the superintendent of insurance from year to year, for several years past. That on February 10, 1887, on due proceedings had before him, said Webb McNall, as superintendent of insurance of the state of Kansas, properly and legally renewed and extended the certificate of authority of complainant to transact business in said state until the last day of February, 1898, and did then and there issue and deliver to complainant a certificate of authority therefor. A copy of the certificate is attached to the bill. That complainant paid to defendant for issuing said certificate the full sum required by law to be paid, to wit, the sum of $50, and also other fees in the sum of $50. That since February, 1897, complainant has continued to transact the business of life insurance in said state under the authority of said certificate, and is now engaged in transacting a large and profitable business, and has at this time full authority to continue in the transaction thereof, and that there is no legal or valid reason why it should be prevented or forbidden from so continuing to transact its business in said state until the last day of February, 1898. The complainant then recites at length the facts concerning the issuance of two policies of insurance on the life of one Pertha E. Emery, of Wyandotte county, Kan., during the year 1896, one in the sum of $288, and the other in the sum of $500, and alleges that in her written applications for said policies she purposely made false and fraudulent representations and concealments concerning her health and physical condition, etc.; that the assured died on the 3d day of February, 1897; and that by reason of her fraudulent representations and concealments said policies were void, and complainant is not, and should not be, held to the payment of the same. The complainant further avers: That on the 11th day of May, 1897, the defendant wrote and mailed a letter to complainant, of which the following is a copy:

"Topeka, May 11, 1897.

"George B. Woodward, Secretary Metropolitan Life Insurance Company, New York—Dear Sir: From evidence presented to this department, I find that on the 19th day of October, 1896, your company issued policy No. 13,863,661 to Pertha E. Emery, of Wyandotte county, Kan., in the sum of $288; that the terms and conditions of such policy provide that one-fourth of the above sum is payable if death occurs within six months from date. Mrs. Emery died on the 3d of February, 1897. There is due upon said policy the sum of $72. Further, your company on the 24th day of November, 1896, issued to the same party policy No. 36,620, in the sum of $500. Under the terms and conditions of this policy a deduction should be made in the sum of $23.58, leaving the amount of the sum due at the time of her death, $476.42, making in the aggregate due on both policies $548.42. Proofs of loss were made in the above cases and delivered to your company. The beneficiaries of these policies are the heirs. The attorneys for the heirs are the firm of Morse & Morse, Kansas City, Kan. No settlement has been made upon these policies. Permit me to say that the letters concerning your company in this state are becoming entirely too frequent, and that if you desire to remain in Kansas, and transact business, you would better adjust this loss."

That on the 15th day of May the complainant wrote and mailed to the defendant a letter, of which the following is a copy:

"New York, May 15, 1897.

"Hon. Webb McNall, Superintendent of Insurance, Topeka, Kansas—Dear Sir: We have received your letter of the 11th of May in reference to the claims on these policies. Your letter closes as follows: 'Permit me to say that the letters concerning your company in this state are becoming entirely too frequent, and that this department desires to suggest that if you desire to remain in Kansas, and transact business, you had better adjust your losses as they occur.' We respectfully protest against this sentence. We have no knowledge of the frequency of the letters concerning this company received by you. We have, however, before this, received only one communication from you. That was concerning a death claim, known from your statements in the newspapers as the 'Dunn Claim,' which had been paid several days before your letter was received. Your letter was entirely unnecessary in that case. The claim was investigated and paid in due course of business, without any knowledge on our part that it had been brought to your notice, and payment had never been refused. As this is the only case to which you have ever previously called our attention, we protest that it does not form a basis for the threat contained in your letter. We also protest against the prejudgment of the two policies, numbered above, which is involved in the concluding sentence of your letter: 'My advice to you is to proceed and adjust this loss.' We do not owe anything upon these policies. You say the claimant has put her claim in the hands of lawyers. We are entirely willing that they shall bring suit, and to abide by the result of the trial. If the court shall adjudge that we owe this money, we will pay it; otherwise not, for we do not owe it. We protest against your assumption that we owe this claim without having heard the evidence. We do not know any reason why insurance companies' rights to a fair day in court are not equally guarantied by the constitution and laws with the rights of other citizens. We deny your jurisdiction to deliver judgment, and assert that if you had jurisdiction it would be your duty to hear both sides before deciding. It is our custom to pay just claims, and many unjust claims, as soon as they are received. Occasionally, however, but very seldom, we have been imposed upon to such an extent that we believe it is our duty to the public to defend the claims to prevent conspiracies to rob insurance companies. The amount of the claims in these two cases is small, and our defense of them will probably cost more than the amount. The fraud attempted, however, was so aggravated, that we believe it to be our duty to contest the cases in the public interest. The insured under these policies had, at the time of making application to us, for many years been suffering from angina pectoris. She concealed this fact from our agent and from our physician. It is not a disease such as can at all times be detected by physical examination. It is a disease, however, which is certain to progress, and is certain to be fatal, and is incurable. Our physician who examined the lady in question asked her the questions contained in the applications about diseases of the heart, as well as other organs, and about her previous attendance by physicians. She denied any disease, and she denied any attendance by a physician, except that she admitted having been attended for some nervous prostration during change of life. We now find the fact to be that this woman had been under the care of a physician for many years, the attendance going back as far as the year 1887,—the policies being dated in 1896. We find she knew perfectly well of the disease she had, and that it was serious, and that she took care of herself on account of it. We have witnesses to prove this, and that the examination made by our physician was careful; that the questions were put one by one, and the answers given were correctly recorded. Under the terms of the contract the policy was avoided by this deliberate misrepresentation and fraud of the insured. We live up to our contracts, and other people should be required to do the same. Under these circumstances, we decline to pay this claim."

That each and every statement in said letter was authorized by the complainant, and was true. That said McNall, as superintendent of insurance, received said letter about the 20th day of May, 1897, and immediately thereupon, without legal authority so to do, and arbitrarily, capriciously, and maliciously, attempted to exclude complainant from transacting life insurance

business in the state of Kansas, and to revoke the authority of complainant to do business in said state by virtue of the license theretofore duly granted, and did arbitrarily, capriciously, and maliciously issue his order directing complainant to "cease soliciting business, receiving premiums, and issuing policies after this date in this state." That said order is as follows:

"Topeka, May 20th, 1897.

"Haley Fiske, Vice Prest. Metropolitan Life Ins. Co., New York, N. Y.—Dear Sir: I have received your communication, dated May 15th, concerning the claim of the heirs of Pertha E. Emery under policy No. 13,863,661 and No. 38,-620. I also note that you say you will not pay the death loss accruing upon such policy as requested by this department, and that the parties are at liberty to sue as soon as they see fit; that you propose to contest said claims upon the ground that Pertha E. Emery made false and fraudulent representations to your company at the time the aforesaid policies were issued. Permit me to say that I know of no reason why you should not contest every policy in existence in this state upon which a loss occurs, but while you are doing so you will be required by this department to refrain from doing business in this state; hence I have this day revoked your authority to do business in this state by virtue of the license granted to you on the 6th day of February, 1897. You will govern yourselves accordingly, and cease soliciting business, receiving premiums, and issuing policies after this date in this state.

"Respectfully yours,                    Webb McNall, Superintendent."

That defendant at the same time wrongfully and maliciously printed in the State Journal, a paper having a general circulation in the city of Topeka, the following notice:

"Notice.

"To Whom it may Concern: I hereby certify that on this, the 20th day of May, 1897, I have revoked the authority of the Metropolitan Life Insurance Co. of New York, N. Y., to do business in the state of Kansas. All persons interested will take notice, and govern themselves accordingly.

"Witness my hand and seal this 20th day of May, 1897.

"[Seal.]                          Webb McNall, Commissioner."

That said defendant has ever since said date wrongfully and unlawfully attempted to enforce his said order against complainant, in violation of its rights and privileges, the said defendant well knowing that said complainant was perfectly solvent, and had paid every valid claim or obligation incurred or owing by it. That the defendant is without authority to impose the terms and conditions which he has attempted to impose upon the complainant, nor has he legal authority to arbitrarily exclude the complainant from the transaction of business within the state of Kansas. That said defendant has unjustly discriminated against the complainant, and between it and other life insurance companies transacting business in said state, and threatens to commence other proceedings against complainant, and to interfere with and utterly destroy its business within the state of Kansas. That if he is permitted to carry out his said order, the complainant will be unable to transact any business within said state. That said order has prevented complainant from receiving premiums in the usual and ordinary course of its business, not only in Kansas, but in other states, and has already obstructed and injured the complainant in its business, in Kansas and elsewhere, in the sum of $50,000. That defendant threatens to persist in his purpose to prevent complainant from transacting any further business in said state, and threatens that he will wholly destroy its business if said complainant shall presume to insist upon its legal rights. That the damage to complainant will be irreparable unless the defendant is restrained by the order of this court from attempting to prevent the complainant from doing business in the state, and that complainant would be compelled to resort to a multiplicity of suits in order to enforce its legal rights. The complainant further avers that said defendant is wholly insolvent, and unable to pay any damages that may accrue to the complainant on account of his wrongful acts aforesaid, and that it has no adequate remedy at law; and complainant prays that an injunction issue out of this court against said defendant, as superintendent of insurance, restraining him from interfering with or attempting to in-

terfere with, complainant's business of life insurance, and in soliciting and re-ceiving premiums and issuing policies.

Upon presentation of said bill, and on the 1st day of June, this court issued a temporary restraining order as follows:

"It is by this court ordered, adjudged, and decreed that the said defendant, Webb McNall, as superintendent of insurance of the state of Kansas, his agents and employés, and all persons acting for or under him, be restrained from in any manner interfering with the Metropolitan Life Insurance Company, its officers, agents, and employés, in the transaction of life insurance business in the state of Kansas, and also from interfering or attempting to interfere with said insurance company soliciting life insurance business, receiving premiums, and issuing policies on the lives of individuals within the state of Kansas, and that also the said Webb McNall, as superintendent of insurance, be restrained from enforcing or attempting to enforce his order of the 20th of May, 1897, attempting to revoke the authority of said insurance company to do business in the state of Kansas."

The matter comes on for hearing, upon the application for a temporary injunction, upon the verified bill of complaint and affidavits in support thereof.

Waggener, Horton & Orr and D. R. Hite (Albert H. Horton, of counsel), for complainant.

David Overmyer, David Martin, and A. B. Quinton, for defendant.

FOSTER, District Judge (after stating the facts as above). The defendant challenges the jurisdiction of the court in this: that the bill charges the wrongful acts of the defendant to have been done as superintendent of insurance, and purely in his official capacity, and seeks by mandatory injunction of this court to compel said officer to reissue the certificate of authority, and is in reality a proceeding against the state of Kansas. It will be observed that the restraining order heretofore issued is the ordinary injunction. It will be further observed that the bill charges that the defendant's acts were wrongful and malicious, and without authority of law, and illegal and void. It is earnestly contended by counsel for the defendant that this court has no jurisdiction, and in support of this contention counsel relies largely upon In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164.

In the case of Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, which was long subsequent to the Ayers Case, the supreme court had occasion to review at great length this question, and there laid down the doctrine that the court had jurisdiction, and that it was not in violation of the eleventh amendment of the federal constitution to proceed by injunction against an officer of the state seeking to enforce the provisions of an unconstitutional act of the legislature, and the order in that case enjoined the defendants in their official capacity as state officers. The court in said case (page 390, 154 U. S., and page 1051, 14 Sup. Ct.) uses the following language:

"Neither will the constitutionality of the statute, if that be conceded, avail to oust the federal court of jurisdiction. A valid law may be wrongfully administered by officers of the state, and so as to make such administration an illegal burden and exaction upon the individual. * * * They may go beyond the powers thereby conferred, and, when they do so, the fact that they are assuming to act under a valid law will not oust the courts of jurisdiction to restrain their excessive and illegal acts."

In Cunningham v. Railroad Co., 109 U. S. 446, 452, 3 Sup. Ct. 292, 297, it was said:

"In these cases he is not sued as, or because he is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he asserts authority as such officer. To make out his defense he must show that his authority was sufficient in law to protect him."

In Re Ayers, 123 U. S. 500, 8 Sup. Ct. 180, the court quotes with approval the doctrine established in Allen v. Railroad Co., 114 U. S. 311, 5 Sup. Ct. 925, 962, and Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 962, and says:

"The vital principle in all such cases is that the defendants, though professing to act as officers of the state, are threatening a violation of the personal or property rights of the complainant, for which they are personally and individually responsible. * * * 'A defendant sued as a wrongdoer, who seeks to substitute the state in his place, or to justify by the authority of the state, or to defend on the ground that the state has adopted his act and exonerated him, cannot rest on the bare assertion of his defense. He is bound to establish it. * * * It is necessary, therefore, for such a defendant, in order to complete his defense,' to produce a law of the state which constitutes his commission as its agent and warrant for his act. This the defendant in the present case undertook to do.'"

And in the Poindexter Case, cited, the court uses this language:

"The case, then, of the plaintiff below, is reduced to this: He had paid the tax demanded of him by a lawful tender. The defendant had no authority of law thereafter to enforce other payment by seizing his property. In doing so, he ceased to be an officer of the law, and became a private wrongdoer. It is the simple case in which the defendant, a natural private person, has unlawfully, and with force and arms, seized, taken, and detained the personal property of another."

See, also, U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240.

So it will be seen that, so far as the case at bar is concerned, there is nothing in the Ayers Case that justifies the contention of the defendant that the state of Kansas is in reality the defendant in this action. The complainant has predicated its case on the want of legal authority of the defendant under the laws of Kansas to do the act complained of. The superintendent of insurance seeks to justify his action under the statutes of the state, but, in the words of the supreme court:

"The court is not ousted of jurisdiction because he asserts authority as such officer. To make out his defense, he must show that his authority was sufficient in law to protect him."

The defendant insists that under the laws of Kansas he not only has authority to arbitrarily refuse permission to insurance companies to do business in the state, but also to revoke such licenses without giving any cause therefor. The complainant contends that there is no law of the state authorizing the defendant to revoke its certificate for the reasons given by him. It further contends that, if the state has given such authority, it is repugnant to the constitution of the United States. The case chiefly relied on by defendant is Insurance Co. v. Wilder, 40 Kan. 561, 20 Pac. 265, and it becomes necessary to briefly examine that case, and see what were the facts, and just what was decided by the court. It appears from the record that one D. W. Wilder, then being superintendent of insurance of the state, arbitrarily refused to issue a permit to said insurance company, though solvent, responsible, and law-abiding, to continue its business in the

state. Whether it was mere caprice of the superintendent, or a desire for notoriety, or even a baser motive, does not appear. The court decided that the defendant's duties in granting authority to insurance companies were not entirely of a ministerial nature, but were largely discretionary, and could not be controlled or directed by the writ of mandamus. It is not to be inferred, however, that the court meant to decide that there was no limit to discretionary power, nor was there involved in that case the power of the superintendent to revoke a certificate of authority already issued. It is not my purpose to detract from that decision, but it is safe to say that no court will be likely to enlarge or extend by implication the doctrine therein enunciated. In the case at bar the superintendent had exercised his discretionary powers, and had found the company entitled to a certificate to do business in the state, and had issued authority for the period of a year, received the fees ($100) therefor, and subsequently collected other fees and charges from the company, none of which sums of money have been returned or tendered to the company. The defendant shortly afterwards revoked or attempted to revoke the certificate, alleging as a cause that the company refused to pay its losses. The complainant asserted that the claim of loss was fraudulent and illegal, and desired to contest it in the courts. Thereupon the defendant, without investigating the facts, laid down the ultimatum that the company should pay the claim or quit doing business in the state. The company refusing to yield, the defendant revoked its authority to do business in the state, and further ordered that it "cease soliciting business, receiving premiums, and issuing policies after this date in this state."

Reverting, again, to the proposition before stated, has the superintendent of insurance, under the statutes of Kansas, the authority, arbitrarily and without cause, to revoke and cancel the certificate of the complainant to transact business in the state? The cause assigned for the act of the defendant is no cause recognized by law. The complainant has the legal right to resort to the courts for the settlement of controversies between it and its policy holders, and to say that it must either forego its legal rights in that respect, and submit to pay all claims made against it, or quit business in the state, is arbitrary, unreasonable, and dictatorial. Is there anything, express or implied, in the statutes of Kansas, indicating any such intent of the legislature, or giving any authority to the superintendent to dictate such terms? In the case of Insurance Co. v. Wilder, supra, the court uses this language:

"One of the principal objects of the act creating the insurance department, and the office of superintendent, is the protection of the insured by excluding from the state such companies as are unsound and irresponsible. To accomplish this, large powers and considerable discretion must necessarily be lodged with some one."

Again, the court says:

"The superintendent has no right to discriminate in favor of one company and against another of the same character and standing, nor to arbitrarily and capriciously exclude any company from the state. He is expected to honestly investigate, and determine, under the rules furnished for his guidance, whether the conditions and requirements of the legislature have been complied with."

In reference to the authority of the superintendent of insurance to revoke the authority granted to companies to do business within the state, 1 Gen. St. 1889, p. 971, § 11 (paragraph 3324), provides as follows:

"Whenever it shall appear to the superintendent of insurance from the report of the person appointed by him, or other satisfactory evidence, that the affairs of any company, partnership or association, not organized under the laws of this state, are in an unsound condition, he shall revoke the authority granted to such company to do business in this state, and cause a notice thereof to be published in at least one newspaper published in the city of Topeka; and after the publication of such notice, it shall not be lawful for the agents of such company to procure any new applications for insurance, or issue any new policies."

Section 17 of the act provides what fees and moneys shall be paid by foreign insurance companies to entitle them to licenses to transact business within the state, and it is provided by the last clause of said section as follows:

"In case of neglect or refusal by any such company to pay said sum, the superintendent of insurance shall revoke the authority or license granted such company."

Section 80 (paragraph 3404) 1 Gen. St. 1889, reads as follows:

"Whenever any insurance company incorporated under the laws of any other state or country shall become liable to pay any loss to any person in this state, and shall neglect or refuse for three months after final judgment to pay the same, and all costs of suit incurred in prosecuting the claim of the insured to judgment, the said company may be perpetually enjoined from doing any business in this state until said claim and costs shall be fully paid."

The act of 1889 (chapter 159) contains the following provisions concerning the issuance and revocation of certificates of authority:

"Provided, however, that the superintendent of insurance shall have no power or authority to refuse an insurance company a certificate of authority to do business in the state, if such company is solvent, and has fully complied with the laws of the state; and provided further, that such superintendent of insurance shall have no authority to revoke or suspend the certificate of authority of any association or corporation transacting insurance business, if such association or corporation is solvent and complies with all the laws of the state. And also, it is further provided, that in all actions brought against the superintendent of insurance to compel him by mandamus or otherwise, to issue certificates of authority to any association or corporation desiring to transact insurance business in this state, and in all cases brought against the superintendent of insurance to restrain or enjoin him from revoking or suspending the certificate of authority of any association or corporation transacting insurance business in this state, such action or actions must be commenced and maintained in the county where the office of the superintendent of insurance is located and carried on."

These are the only provisions found in the statutes of Kansas touching the authority of the superintendent of insurance to revoke certificates granted to insurance companies to do business in the state, and, so far from giving the authority assumed by the defendant in this case, it clearly appears that his action is beyond any express or implied sanction of the law; indeed, section 80, above quoted, indicates clearly that the legislature intended that insurance companies should have the right to contest claims against them in the courts. and it provides that, unless judgments so obtained against them shall be paid within the period of three months, they shall be prevented from transacting

896     81 FEDERAL REPORTER.

any further business within the state, not by revocation of their license, but by judicial process.

The complainant contends that the act of 1889, which was passed subsequent to the decision of the Wilder Case, has materially restricted the powers of the superintendent of insurance. That act is entitled "An act relating to insurance, and amendatory of section 24 of chapter 132, Laws of 1885," etc. Here are two clauses named in the title,—the first, an act relating to insurance; the second, amendatory of another act. Section 1 is chiefly given to amending the law of 1885 concerning mutual fire insurance companies, but there are three provisos inserted in the section. These provisos, in terms, limit and restrict the powers of the superintendent of insurance, not to mutual fire insurance companies alone, but to all insurance companies. Note the general terms of the second and third provisos before quoted. The superintendent of insurance shall have no authority to revoke or suspend the certificate of any association or corporation transacting business if such corporation is solvent and complies with the laws of the state. The third proviso requires any association or corporation bringing suit to compel the superintendent to issue certificates, or to enjoin him from revoking them, to bring the suit in the county where he keeps his office, which is the county where this suit is brought. Now, can it be said that the legislature intended that all these regulations and privileges should apply to mutual fire insurance companies alone, while the great mass of the insurance business was transacted by other companies? The title of the act is sufficiently broad, and the terms of the provisos sufficiently general, to include any and all insurance companies; and it is evident to me such was the legislative intent.

In reference to the authority of this court to grant the relie° under the last proviso of the act, it was expressly decided in the Reagan Case (see pages 391, 392, 154 U. S., and page 1047, 14 Sup. Ct.) that under a similar statute of the state of Texas the federal courts have equal jurisdiction with the courts of the state, if complainant was a citizen of another state. If the statutes of Kansas would bear the construction contended for by defendant, giving him authority to revoke the certificates of authority of insurance companies because they refused to give up their rights to resort to the courts for redress and settlement of disputed claims, the question arises, could the state impose such terms on the companies? It must be admitted that the state of Kansas has the right to exclude foreign corporations entirely from doing business in the state, and it may impose any terms not objectionable to the constitution or laws of the United States, on any such corporations, as a condition to their doing business in the state. Insurance Co. v. French, 18 How. 404; Paul v. Virginia, 8 Wall. 168; Insurance Co. v. Morse, 20 Wall. 456; Doyle v. Insurance Co., 94 U. S. 535; Barron v. Burnside, 121 U. S. 199, 7 Sup. Ct. 931. The defendant relies upon the Doyle Case to sustain his contention. In that case, the laws of Wisconsin in terms required the defendant to do the act complained of, to wit, revoke the license of the insurance company, and the company had signed and filed its consent to the law as a condition to receiving permission to do business in the state, which

consent was that it would not remove its suits from the state to the federal courts. This decision, sustaining the law, was made by a divided court; but in the later case of Barron v. Burnside, 121 U. S. 199, 7 Sup. Ct. 931, the court affirmed the Morse Case, which held such a stipulation invalid, and explained and limited the Doyle Case. The court, speaking of the rule established in the Morse Case, says (94 U. S. 538):

"This was upon the principle that every man is entitled to resort to all the courts of the country, to invoke the protection which all the laws and all the courts may afford him, and that he cannot barter away his life, his freedom, or his constitutional rights."

The temporary injunction will be granted.